IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| NATHEON R. BERNA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. CIV-23-325-SPS |
| ) | |
| MARTIN O'MALLEY,[1] ) | |
| Commissioner of the Social ) | |
| Security Administration, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

The claimant, Natheon R. Berna, requests judicial review of a denial of benefits by the Commissioner of the Social Security Administration pursuant to 42 U.S.C. § 405(g). He appeals the Commissioner's decision and asserts that the Administrative Law Judge ("ALJ") erred in determining he was not disabled. For the reasons discussed below, the Commissioner's decision is hereby REVERSED and REMANDED.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience,

---

[1] On December 20, 2023, Martin J. O'Malley became the Commissioner of Social Security. In accordance with Fed. R. Civ. P. 25(d), Mr. O'Malley is substituted for Kilolo Kiakazi as the Defendant in this action.

engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id*. § 423 (d)(2)(A). Social security regulations implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[2]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether correct legal standards were applied. *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). *See also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The Court may not reweigh the evidence or substitute its discretion for the Commissioner's. *See Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800 (10th Cir. 1991). But the Court must review the record as a whole, and "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). *See also Casias*, 933 F.2d at 800-01.

---

[2] Step one requires the claimant to establish that he is not engaged in substantial gainful activity. Step two requires the claimant to establish that he has a medically severe impairment (or combination of impairments) that significantly limits his ability to do basic work activities. If the claimant *is* engaged in substantial gainful activity, or his impairment *is not* medically severe, disability benefits are denied. If he *does* have a medically severe impairment, it is measured at step three against the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1. If the claimant has a listed (or "medically equivalent") impairment, he is regarded as disabled and awarded benefits without further inquiry. Otherwise, the evaluation proceeds to step four, where the claimant must show that he lacks the residual functional capacity ("RFC") to return to his past relevant work. At step five, the burden shifts to the Commissioner to show there is significant work in the national economy that the claimant *can* perform, given his age, education, work experience, and RFC. Disability benefits are denied if the claimant can return to any of his past relevant work or if his RFC does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

## Claimant's Background

Claimant was born on June 1, 1982, and was 34 years old on the alleged disability onset date, February 27, 2017. (Tr. 2119, 2131). He was 40 years old at the time of the most recent administrative hearing. (Tr. 2142). He has a high school level education obtained by completing a GED program and has past relevant work experience as a construction worker, crane operator, and as a pizza cook. (Tr. 2149-2150). Claimant asserts he has been unable to work since February 27, 2017, alleging disability due to issues arising from a car accident in 2017 including osteoarthritis/degenerative joint disease and internal derangement of the left knee status post-two surgeries, right biceps tenosynovitis/impingement bursitis, bilateral lower extremity sensory neuropathy, obesity, chronic pain syndrome, and a history of fractures the pelvis, bilateral L5 transverse processes, multiple bilateral ribs and sternum. (Tr. 2122).

## Procedural History

Claimant applied for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act (Act). (Tr. 240-52). Claimant's claims were denied after four levels of administrative review. (Tr. 1-6, 21-45, 53-77, 98-165, 167-73). This Court remanded the issue to the Commissioner for further proceedings. (Tr. 2241-45). On remand, following a hearing, in a decision dated July 20, 2023, the ALJ found that Claimant was not under a "disability" as defined in the Act. (Tr. 2116-41). The ALJ's decision is the final decision of the Commissioner, as the Appeals Council declined to assume jurisdiction and Claimant did not file exceptions to the ALJ's decision. *See* 20 C.F.R. §§ 404.984, 416.1484.1 This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). 20 C.F.R. § 422.210.

**Decision of the Administrative Law Judge**

The ALJ made his decision at step five of the sequential evaluation. At step two, the ALJ found that Claimant had several severe and non-severe impairments. (Tr. 2122-2123).

Next, he found that Claimant's impairments did not meet a listing. (Tr. 2125). At step four, he found that Claimant retained the residual functional capacity ("RFC") to perform a range of sedentary work with the following nonexertional limitations:

> occasionally climb, balance and stoop, he can perform no kneeling, crouching, or crawling, and he can perform no overhead reaching/overhead work with his non-dominant right upper extremity.

(Tr. 2125).

The ALJ found that this RFC did not allow Claimant to perform his past relevant work, but found in the alternative at step five, based on testimony form the vocational expert at Claimant's hearing, that Claimant could perform jobs that existed in significant numbers in the national economy. (Tr. 2131-2132).

**Review**

Claimant contends the ALJ erred because the RFC finding is inconsistent with the evidence causing error at Step Five. The Court agrees and the decision of the ALJ must therefore be reversed.

The relevant medical evidence before the ALJ reflects the following:

Claimant was an unrestrained passenger in the backseat of a motor vehicle rollover accident on February 27, 2017. (Tr. 560). Claimant sustained a left occipital condyle fracture, multiple rib fractures, a right pulmonary contusion, comminuted sacral fractures, L5 transverse process fractures and a right posterior ischium fracture. (Tr. 436). He underwent closed reduction and percutaneous pinning of bilateral sacral fractures and closed treatment without manipulation of the

ramus fracture. (Tr. 507). While hospitalized, Claimant reported pelvic pain mostly in his sacral area as well as left knee pain, although left knee x-rays were unremarkable. (Tr. 480, 503). He was discharged after approximately two weeks and entered a rehabilitation program. (Tr. 660-726). He subsequently received home health care through late May 2017. (Tr. 727-852).

In July 2017, Claimant followed up with orthopedics concerning his motor vehicle injuries and reported some numbness in his feet as well as pain. He had weaned himself from crutches and pain medications. Claimant walked slowly without a limp and had good bilateral hip flexion. Claimant had assessments of fractures of his sacrum and right ischium and multiple closed unstable fractures of his pubic ramus with routine healing and was to return in two months. He was weight-bearing as tolerated on his bilateral legs. (Tr. 1104-1105).

Claimant saw orthopedics in August 2017 for left knee pain. He had full range of motion in his knee without effusion, full stability, pain upon palpation, and the inability to tolerate a pivot shift test and McMurray testing. X-rays were unremarkable and an MRI scan was ordered for suspicion of a meniscal tear. (Tr. 1100). Claimant underwent left knee arthroscopy in August with partial lateral meniscectomy, chondroplasty of the medial femoral condyle, and partial synovectomy. (Tr. 1424, 1430). At a follow up in mid-September, he reported that he continued to have some pain with ambulation, with examination demonstrating full range of motion and no instability. (Tr.1424). Claimant followed up with orthopedics in October 2017 and reported he did not have a lot of pain. He had been walking for exercise and strengthening but felt weak in his lower leg. Claimant's left lower leg on examination had full range of motion with no instability and no significant pain and he was to continue with physical therapy. (Tr. 1455).

Claimant saw orthopedics in November 2017, at which time he was weight-bearing as tolerated, performing physical therapy, and doing well in general. He had some generalized back

pain that was intermittent, without relieving or exacerbating factors and without radicular symptoms or numbness. He was in a work assistance program as he did not feel he could go back to washing dishes due to back pain. He had weaned himself from pain medications and had been approved for medical marijuana. Examination demonstrated no pain with range of motion, no pain with pelvic compression, and no tenderness to palpation over the thoracic or lumbar spine or sacrum. X-rays showed maintained alignment of a well-healed sacral body fracture with no loss of reduction and hardware in the right position. Claimant's sacral and ramus fractures appeared to be well healed and did not appear to be the source of his back pain. Claimant was informed that residual sacral pain was common due to the nature of his injury. (Tr. 1632-1633).

Claimant followed up for left knee surgery status post-3 months on December 8, 2017. He had full range of motion and stiffness with no instability but increased pain and received an injection. (Tr. 1500). He requested referral to pain management in December 2017 for chronic pain in the lumbar area with sciatica and bilateral gluteal muscles, left ankle and knee pain. (Tr. 1620).

Claimant saw Carla Walker, APRN, in January 2018. Claimant had been taking gabapentin and diclofenac and reported his back still hurt with activity. He reported his balance was off. On examination he had an antalgic gait and ankle edema with muscle spasms of the lumbar region and was referred to neurology. (Tr. 1690-1691).

Claimant initiated pain management treatment in January 2018 for chronic pain and was prescribed oxycodone. (Tr. 1661-1669). Claimant followed up with Nurse Walker in February and reported recent pain medication had helped with his activities daily living some, but he still had spasms. He had an appointment with neurology in February. (Tr. 1693-1694).

Claimant saw neurologist Dr. Steve-Felix Belinga on February 15, 2018, with complaints of low back pain and numbness in his bilateral legs. Claimant presented alert and attentive and

followed commands appropriately with fluent speech, normal muscle tone and bulk and normal strength with reflexes 2+ throughout with no ataxia but an antalgic gait with paresthesia/numbness in his toes. Claimant reported residual nerve pain from his motor vehicle accident. Nerve conduction studies were ordered, as well as an MRI scan of the lumbar spine and his gabapentin dosage was increased. (Tr. 1672-1676). Nerve conduction studies of the lower extremities demonstrated mild to moderate sensory neuropathy bilaterally. (Tr. 1678). An MRI scan of Claimant's lumbar spine was unremarkable as metal artifact limited evaluation of L5/S1. (Tr. 1681).

In April 2018, Claimant saw Nurse Walker and requested another referral to pain management as his previous one had expired. (Tr. 1700-1701). Claimant saw Nurse Walker in May and reported swelling of his ankles and was encouraged to hydrate more often. He had spasms in his bilateral hamstrings when he was on his feet a lot with upcoming consultation for steroid injections. (Tr. 1703-1705). Claimant returned in June and reported he still had swelling when he was out in the heat but not otherwise. He had upcoming injections and reported calf pain relieved by CBD oil. (Tr. 1707-1708).

Claimant reported his left knee was better in August 2018 with some leg cramps that he reported resolved in a couple of weeks. Claimant sought orthopedic referral for elbow and right shoulder problems. (Tr. 1947-1951). Claimant continued pain management in 2018 with a regimen of gabapentin and oxycodone. (Tr. 1788, 1799, 1807).

At pain management appointment in January 2019, Claimant was awake, alert, well-groomed, relaxed and breathing without effort. He had tenderness in his lumbar spine with reduced range of motion and 4/5 muscle strength in all major muscle groups. He was oriented, had clear and fluent speech, had coherent thought process with good insight, had intact recent and remote

memory, had intact higher cognitive functions, was able to perform simple calculations and understood proverbs, had a neutral mood, and had an appropriate affect. His diagnoses were other intervertebral disc degeneration of the lumbar region, radiculopathy of the sacral and sacrococcygeal region, neuralgia and neuritis, low back pain, and chronic pain syndrome. (Tr. 1776-1778). With pain management in March, his medication regime was continued as it reportedly controlled his pain while allowing him to perform activities of daily living without side-effects. (Tr. 2001).

In April 2019, Claimant saw Dr. Steven Smith with orthopedics for his left knee. Examination showed moderate effusion, tenderness about the medial joint line, and positive provocative maneuvers and was suspicious for a medial meniscus tear. Dr. Smith noted that a prior MRI scan had shown a tear, although one had not been found at the time of the arthroscopy. Surgery was recommended that Claimant had in mid-April; post-operatively Claimant's wound looked "perfect minus the swelling." (Tr. 2081-2091). Follow-up records from June reflect Claimant could fully flex and fully extend his knee with no extension lag noted and was ligamentously stable but had some swelling that was aspirated. (Tr. 2100-2101).

Claimant saw orthopedic surgeon Dr. Timothy Garlow in November 2019 with complaints to his right shoulder as he was having difficulty with overhead maneuvers. Claimant had impingement bursitis type symptoms and arthroscopy was recommended. (Tr. 2102-2103).

Claimant saw Nurse Walker in January 2020. He reported his right shoulder had frozen up a few weeks previous, but it was better now. He sought another referral for surgery for left knee pain. He reported recent right thumb injuries while he was pushing the merry-go-round for his kids the previous day and hyperextended it. (Tr. 2413-2416).

Claimant saw primary care in September of 2022 and reported chronic left knee pain since a motor vehicle accident four years ago with no relief from over-the-counter medications. Claimant was referred to orthopedics and an MRI scan was ordered. (Tr. 2517-2518). An MRI scan of Claimant's left knee from October 2022 demonstrated moderate-severe medial tibiofemoral compartment degenerative changes with meniscal tear and joint effusion. (Tr. 2525). Claimant saw primary care in December of 2022. Claimant had a BMI of 9.8 and had assessments of folliculitis and osteoarthritis of the left knee without abnormalities noted on physical examination. (Tr. 2516-2517).

Claimant had a physical consultative examination with Dr. Ted Honghiran in June 2019. Claimant reported ongoing pain in his lower back and pelvic areas from a motor vehicle accident in 2017. He reported problems with his left knee and walked with a limp on the left side. He was able to get on and off the examination table with no problems. Claimant had a slightly reduced range of motion of the lumbar spine in flexion, i.e., 80/90°, in extension, i.e., 10/25° and in lateral flexion, i.e., 10/25°. Dr. Honghiran assessed that he had good range of motion of the lumbar spine with no severe pain or muscle spasms noted with straight leg raises negative bilaterally with normal reflex and sensation. Claimant had swelling of the left knee with pain on range of motion of the left side with stable ligaments. Dr. Honghiran assessed that he would not be able to return to construction type of work but that he should be able to do some type of job sitting down. (Tr. 2092-2096).

In December 2019, Dr. Honghiran completed a questionnaire concerning Claimant's physical residual functional capacity assessment. He assessed Claimant could frequently lift/carry up to 20 pounds, could sit for four hours in an eight-hour workday and could stand/walk for two hours each in an eight-hour workday. Claimant could never climb stairs, ramps, ladders, or

scaffolds with otherwise frequent postural restrictions. Claimant had restrictions to hazards and other environmental factors including pulmonary irritants and temperature extremes. (Tr. 2107-2113).

The State Agency consultants who examined the medical evidence of record at the initial and reconsideration levels, Dr. James Wellons, and Dr. Kristin Jarrard, assessed Claimant was capable of the full range of light exertional work despite his severe physical impairments. (Tr. 100-129, 132-165).

The Court finds, *inter alia*, that the ALJ's RFC finding is inconsistent with the evidence. The RFC is the most Claimant can do on a regular and continuing basis despite his limitations. 20 C.F.R. § 404.1545, 20 C.F.R. §416.945. The RFC should not include those activities that Claimant can do sporadically; instead, it can only include what he can sustain for eight hours a day, five days a week. Social Security Ruling 96-8p. The ALJ is required to consider all Claimant's medically determinable impairments, singly and in combination; the statute and regulations allow nothing less and a failure to do so is reversible error. *Salazar v. Barnhart*, 468 F.3d 615, 621 (10th Cir 2006). The ALJ may not ignore evidence that does not support his decision, especially when that evidence is significantly probative. *Biggs ex rel. Briggs v. Massanari,* 248 F.3d 1235, 1239 (10th Cir. 2001). Furthermore, the ALJ must support his conclusions with specific references to the evidence in the record and interpret that evidence fairly. *Winfrey*, 92 F.3d at 1024 (the ALJ erred by failing to relate his conclusions to the evidence). In the instant case, the ALJ determined that Claimant has the RFC to perform a full range of sedentary work; could occasionally climb, balance, and stoop; could not kneel, crouch, or crawl; and could not perform overhead reaching or overhead work with the non-dominant right upper extremity. (Tr. 2125). This finding is not supported by substantial evidence.

First, the ALJ omitted limitations related to Claimant's mental impairments. A severe impairment is defined as one which significantly limits the physical or mental ability to perform basic work tasks. 20 C.F.R. §404.1520(c); 20 C.F.R. §404.1522. In the AC's remand orders, it instructed the ALJ to reevaluate Claimant's mental disorders. In the current decision, the ALJ determined once again that Claimant's mental impairments were not severe. (Tr. 2123). However, these findings are inconsistent with the facts.

Claimant has a longstanding history of depression and anxiety. Since his car accident in 2017, he has suffered from chronic pain and reduced functioning, and this has exacerbated his psychological impairments. (Tr. 1959). In 2014, Claimant was irritable and withdrawn, was suicidal, was missing work, and Dr. Baker prescribed Paxil for depression. (Tr. 1516-1517). After he failed to benefit from counseling and was having increased symptoms, such as racing thoughts and excessive worry, Dr. Baker prescribed Cymbalta and Klonopin. (Tr. 1116, 1264, 1275).

Claimant exhibited signs of PTSD after his accident. (Tr. 1112). In July 2017, he presented to the emergency room with suicidal thoughts and depression and was transferred to Baptist Hospital in Little Rock for an inpatient stay. (Tr. 1083-1084, 1106, 1108, 1110).

Claimant's PHQ9 score has been elevated into the moderately severe or severe range on numerous occasions. (Tr. 1101-1103, 1698, 1766, 1955, 1961). His primary care provider prescribed medication and referred him to a psychiatrist. (Tr. 1701). Some medication lost its efficacy or was not covered by his insurance. (Tr. 1693, 1697).

In October 2018, he was depressed, agitated, short-tempered, anti-social, angry, and tired all the time. (Tr. 1953, 1954). He saw Dr. Witherington at Perspectives in January 2019, who diagnosed major depressive disorder, recurrent episode, severe, and generalized anxiety disorder.

(Tr. 1771). Plaintiff's symptoms were low mood, feelings of hopelessness, sleep disturbance, feelings of guilt, low energy, passive death wish, and excessive worry. (Tr. 1765-1766).

Claimant also received mental health care treatment at Creoks Behavioral Care. He reported feelings of despair, lack of motivation, low self-esteem and difficulty staying focused. (Tr. 2435-2436). His exams were notable for disorganized thought processes, anxious mood, and distractibility. (Tr. 2475-2477, 2488-2490, 2501-2503). He attended therapy, where his goals for treatment were learning to cope with depression and interacting more with others (Tr. 2448-2449).

These treatment records are consistent with his testimony that he suffers from depression, panic attacks, and suicidal thoughts with low energy, lack of focus and concentration, and depressed mood. (Tr. 2159, 2165-2167, 2169-2170).

The ALJ found Claimant's symptoms were not severe and were situational, (Tr. 2123), but the record demonstrates Claimant had mental health issues independent of his accident, break-up, or other life changes. Claimant has reported poor energy, irritability, anger, depressed mood, and he has exhibited symptoms such as disorganized thoughts and distractibility. All this evidence, including his elevated PHQ9 scores, are inconsistent with the ALJ's finding that the evidence does not demonstrate a severe psychological impairment. (Tr. 2123).

Further, the ALJ cited a few things repeatedly in this segment of the decision, such as Claimant's ability to grocery shop and his recent employment. However, the ALJ failed to mention pertinent aspects of those activities. For example, Claimant testified he only goes to Walmart for 20-30 minutes a week. Further, Claimant's ability to work a few hours a week is not indicative of his ability to work in a competitive environment since, at his current job, he is not under pressure to meet production quotas, or work at a competitive or continuous pace. Additionally, Claimant did not attempt this work activity until almost 5 years after his onset date and, even then, was not

able to maintain a full-time schedule for very long. The ALJ's decision to emphasize Plaintiff's trial of full-time work in 2021 and 2022 as a determining factor of the severity of his mental impairments from 2017 to 2021, or beyond, is improper. Other evidence reveals limitations the ALJ failed to address, such as those related to anger, irritability, feeling tired all the time, and depressed mood. When considered as a whole, the evidence suggests that Claimant's mental impairments could significantly impact his work functioning. Social Security Ruling 16-3p; *Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004) ("It is improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence."); *Hierstein v. Chater*, 1997 WL 158177 (10th Cir. 1997) (The ALJ's omission of findings that show a more severe impairment "downplay[s] the severity of a chronic mental impairment inherently varying with the vicissitudes of the patient's life [and] reflects the kind of misleading selective inquiry courts have decried on numerous occasions."). The ALJ's rejection of Claimant's mental impairments at step two led to the ALJ's improper omission of the accompanying limitations from the remainder of the sequential evaluation process.

Further, sedentary work requires the ability to stand and walk for two hours per workday and sit for six hours per workday. Social Security Ruling 83-10. The evidence reflects that, after his accident, Claimant has been incapable of regularly and consistently performing these activities. He had pelvic, sacral, and low back fractures, and he has suffered subsequent pain, radiculopathy, and neuropathy. His chronic pain intensifies if he stays in one position for long. (Tr. 987, 1879-1882, 2163). Because he cannot comfortably sit in a regular chair for very long, he needs to recline or lie down. Even at work, he sits in a chair that leans back and props up his legs any time he can. (Tr. 2160, 2169). Records frequently note abnormalities, such as an antalgic gait, that would

interfere with his ability to fulfill the walking and standing requirements of sedentary work as well. (Tr. 1690-1691).

In addition to this objective medical evidence, the opinion evidence confirms that Claimant cannot sit for six hours per day. Dr. Honghiran found reduced limited range of motion in the spine, (Tr. 2093), limping gait, (Tr. 2094), and swelling in the knees. (Tr. 2095). Based on these findings and Claimant's extensive history, Dr. Honghiran felt that Claimant should sit for no more than four hours per day. (Tr. 2108). The ALJ rejected this opinion. Because of the date of Claimant's applications, the ALJ must rely on 20 C.F.R. §404.1527 to evaluate medical opinions. The ALJ singled out Dr. Honghiran's restriction on the amount of sitting Claimant can do and found it to be unsupported. However, there is nothing in the record that contradicts Dr. Honghiran's assessment, and it is consistent with Claimant's severe injuries. As stated above, Claimant has consistently complained of back, sacral, and buttock pain after his multiple fractures, and he must shift from side to side when he is sitting. He also must elevate his legs to remedy his back and knee pain. The ALJ's failed to acknowledge the consistencies between the evidence and Dr. Honghiran's opinion.

Finally, Plaintiff was diagnosed with gastritis, Barrett's esophagus, and gastroparesis. In combination, these impairments cause frequent nausea, vomiting, heartburn, diarrhea, constipation. (Tr. 1254, 1264, 1268, 1502-1503,1576, 1707, 1710, 1947, 1950, 1953, 1959-1960, 2413). On occasion, he had blood in his stool and was throwing up blood, (Tr. 1742, 1947), and his gastroparesis caused poor metabolization of his medication. (Tr. 1886, 1781-1784, 1886). Despite the evidence of frequent nausea, vomiting, and diarrhea, the ALJ omitted the need for frequent breaks to visit the restroom and made no accommodation for the inability to attend to

work tasks or work a full day due to a flare-up of these symptoms. It is unclear why the ALJ ignored this impairment given its prominence in the record.

The ALJ found that Claimant could not return to his past relevant work. (Tr. 2131). Therefore, the burden of proof shifted to the ALJ to show that, despite his limitations, there are other jobs that Claimant can perform which exist in significant numbers in the national economy. *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993). To satisfy this burden of proof, the ALJ posed hypothetical questions to the VE to determine whether Claimant could perform other work in the national economy. Based on that testimony, the ALJ concluded that Claimant could perform the jobs of document preparer, office helper, or assembler and, therefore, was not disabled. (Tr. 2132). However, the ALJ cannot rely on the VE's testimony as support for his denial of benefits because the hypothetical question that generated this testimony was inaccurate. *Hargis v. Sullivan*, 945 F.2d 1482, 1490 (10th Cir. 1991). Claimant cannot perform the long hours of sitting required by sedentary work, cannot sustain full-time activity due to GI issues and fatigue, and has additional mental impairments. After considering a proper set of limitations, the VE testified that Plaintiff could not work. The ALJ erred by formulating an incomplete hypothetical question and by not applying the VE's testimony correctly.

The decision of the Commissioner must accordingly be reversed, and the case remanded to the ALJ for further analysis as discussed above. If on reconsideration the ALJ finds that any changes must be made to the claimant's RFC, he should then redetermine what work, if any, Claimant can perform and ultimately whether he is disabled.

## Conclusion

The Court finds that correct legal standards were not applied by the ALJ, and the Commissioner's decision is therefore not supported by substantial evidence. Accordingly, the

Court finds the decision of the Commissioner is hereby REVERSED and the case REMANDED for further proceedings consistent herewith.

    **IT IS SO ORDERD this 3rd day of August, 2024.**

    _____
    **STEVEN P. SHREDER**
    **UNITED STATES MAGISTRATE JUDGE**